and we'll begin with Ms. Barner. Good morning. Good afternoon. Good morning, Your Honors. Good afternoon. May it please the court. On August 11th of 2016, Mr. Wessel, as he had been many times before, was suicidal. Confronted by the police, Mr. Wessel begged to be shot in the head. And pulling a gun on himself, pulling a gun himself, he was shot by the police. Luckily, Mr. Wessel is still with us today. But since that time, Mr. Wessel's case has become a snarled tangle of mental health concerns. Mr. Wessel's serious mental illness, which long predates the offense in this case, was recognized by the district court, by the prosecution, and by counsel from Mr. Wessel. Ms. Barner, forgive me, but is the issue here that Mr. Wessel had a personality disorder as opposed to a mental illness? Can a personality disorder never be the basis for incompetency alone? I think that's an open question. And I think that, you know, as we cited in the brief, there is some momentum. In fact, in the most recent version of the DSM, they are no longer drawing lines between access one that are clinical disorders or access to their personality disorders, and that some courts are moving away from drawing the line between which one of those things can be reflective of competency and which cannot. I think that the basic question remains, regardless of how we characterize the disorder, is does this particular disorder interfere with the ability of Mr. Wessel to communicate with his counsel in a way that allowed him to assist in his defense? Is the real problem here that the experts and ultimately the district court did not believe in the veracity of his reports of mental illness? I think that in my mind, the real problem in this case is that the very last statement that was made by the district court prior to trial when Mr. Cleary was again trying to raise the competency of his client was the district court said, I have to rely on the experts. And I think that the real problem in this case is that is not the truth. The district court had a host of other information available about Mr. Wessel's competency that was then ignored. I think the district court chose the expert and then crafted the rest of the evidence to be in accord with that expert's opinion. And that's where the real problem lies in, is the district court's failure to take that step backwards from the expert's testimony and look at the case as a whole. So when we do take that step backward in this case and look at the case as a whole, we have a lot of problems. And I don't want to belabor these points, but I think that it's worth taking that step back at this point in the argument to just say, we had at the point that the district court decided on competency for the last time, what we referred to in the brief as this inevitable drumbeat of incompetency in this case. And I just want to briefly touch on those factors before discussing our points in the brief. We had a serious mental health history that significantly predated the offense in this case. We had Mr. Wessel, who was hospitalized or sought emergent care for his mental health issues 30 times. We have evidence that inside institutions and outside institutions, Mr. Wessel was consistently and constantly placed on suicide watch, and that Mr. Wessel made suicide attempts when he was in the Marion County Jail, he tried to hang himself. We had evidence that Mr. Wessel refused to leave a prison because of these delusional beliefs that he held. We had testimony by a friend of Mr. Wessel's who he stayed with, who said he was religiously obsessed, that he believed that God had told him that he would marry a televangelist, that he would go outside and preach loudly, that he believed he was being tracked by a technology and that there was a conspiracy of people who wanted him dead during the course of his trauma. Ms. Varner, can I share a reaction to the facts? I think you've done a very, very fine job on behalf of your client setting forth the facts. I really do. There is no question your client has very serious issues and a very long and troubled history with respect to his mental health. The one person that seemed to understand this and to be as concerned as anybody about it, in my view, was the district court. And one of the strong reactions that I had to preparing for the case, and you can persuade me otherwise, was that Judge Pratt took an awful lot of care because she recognized the gravity of the mental illness that was in front of her with Mr. Wessel. She was evaluated for a very meaningful period of time twice in Chicago, and I think overall, three or four times. And so, don't we have to call the finding that came out of that diligence clear error for Mr. Wessel to appeal, to, you know, succeed here? I understand that we're up against a difficult standard in this case. You know, we are public defenders, and whether or not we think that we may be able to win against the standard that we're up against, we still grant to you. I think that there are cases that become vehicles for this court to instruct the district courts with how to deal with cases in ways that are other than reversal. But I do think that one, I would acknowledge that Judge Pratt was concerned with Mr. Wessel's competency. And I think that's part of our point. Everyone was concerned right up to the moment of trial, right up till sentencing in this case with Mr. Wessel's competency. But that there was an avalanche of evidence in this case that pointed to Mr. Wessel's continuing incompetency at the time of trial, and that Judge Pratt, while she continued to investigate competency, continued to let him be sent away for evaluation, did not take what was, I think, an infinitely reasonable step in this case, and that was to send Mr. Wessel away to be medicated. We had three professionals in this case who said, this could be schizoaffective disorder. And schizoaffective disorder comes with two components. And one of those components is mania and depression. That is capable of being medicated. It also comes with psychiatric features, and that is also capable of being medicated. So we had three out of four medical professionals that said, either said, we can't rule it out, or this is something that in order for us to determine whether or not this is a personality disorder, or if this is a schizoaffective disorder, that we must try medication in order to be able to make that judgment call. And I think, especially in a case where you have these continued hearings aimed at competency, we have to take that final step and say, okay, we've got an avalanche of evidence, and we're not sure in which direction to turn. We've got three medical professionals saying, medication may work. And that that was the final step that had to be taken. And that when instead, the district court issued a final order and said, I must rely on the experts in this case, and stepped outside of all of the other evidence on competency, that that's where the clear error in this case lies. That's the fact that all three of the medical experts were psychologists who cannot administer medication, that can only be done by psychiatrists. Does that make any difference in this case? I think it makes a difference in our ultimate outcome, because right after the very competency hearing, trial counsel in this case tried and had Dr. Bushon Agakar try to have him visit with Mr. Wessel. And Mr. Agakar also said, look, this is something that could be treated, and we should try a course of psychiatric medications here. Mr. Cleary continued to raise that concern that his client needed to be medicated right up until the time of trial. So I don't think it changes the outcome, but it's further evidence that there was one further step that the district court needed to take to ensure that we bought a competent defendant to client. Could I ask a very quick question, please? Is there anything in the record about how much he was able to participate with his counsel after he was removed from the courtroom for most of the hearing? I believe I have entered my rebuttal time. Yeah, we'll give you a final minute, Ms. Varner. Thank you very much. And why don't we turn to Mr. Waringa on behalf of the government. Good afternoon to you. Good afternoon, your honors, and may it please the court. My name is Julian Waringa, and I represent the United States in this appeal. And I would first just briefly to respond to ruling in this case. She, of course, the government's view did not ignore any evidence, and in fact, undertook extensive efforts to ensure that she understood all of the evidence relating to Mr. Wessel's competency before she entered her ruling in this case. But what she said was, well, we have to rely on the experts. And did she not see a role for counsel's assessment? Judge Pratz entered a decision that was very extensive and very detailed and noted in that all of the evidence that had been presented over the course of the three evidentiary hearings and the multiple evaluations that had been entered into the record. So that suggests and states that she did, in fact, take into account both Mr. Wessel's counsel's representations regarding his client, as well as the views of the experts. Well, she seemed to agree with Dr. Schenck. Well, she did agree with Dr. Schenck, who never saw him perform no testing. Now, he would not deal with her. I understand that when he was in the MCC. But Dr. Schenck seemed to be going more with her gut than, for instance, Dr. Callaway, who thought he had a schizoaffective disorder, and that he wasn't competent and that he had no ability to assist with his attorney. Your Honor, Judge Pratz ruling was consistent with the findings of both Dr. Campbell as well as Dr. Schenck. And Dr. Campbell diagnosed the BPD. And Judge Pratz found both the BPD as well as the antisocial personality disorder as alternative diagnoses. And with respect to Dr. Schenck's opinion, Dr. Campbell, of course, was able to interview Mr. Wessel. And Mr. Wessel did cooperate in that instance. And they did have a dialogue. And she was able through that interview process to determine that he, in fact, was competent and capable of understanding what was going on and what he was facing in the trial process. And Dr. Schenck had the benefit of Dr. Callaway's evaluation and opinion and had the benefit of Dr. Campbell's evaluation and opinion. And over the course of the two 45-day periods that Dr. Schenck spent in a facility with Mr. Wessel, she spent time with him. And she did observe him. And she made observations of his behavior, which informed her assessment of his condition. And she also interviewed various prison personnel who were interacting with him on a daily basis, some of whom did, you know, he was willing to cooperate and interact with them. So I think the record reflects both that the court was looking at Dr. Campbell's opinion and based its conclusion on Dr. Campbell's opinion, but also that Dr. Campbell's opinion on a voluntary basis, including from direct observation of Mr. Wessel for her conclusion that he had ASPD. Of course, Dr. Campbell and Dr. Schenck did come up with somewhat different thoughts about the case. I mean, I know it's not fair to look at this through the lens of hindsight, but in fact, at the end of the day, he really wasn't able to participate in his trial. He wasn't able to consult with this lawyer to a reasonable degree. What does that say? Anything at all, do you think? Your Honor, if I may respectfully first address both of your points. With respect to the difference in the diagnoses between Dr. Campbell and Dr. Schenck, from the government's perspective, the important fact is that they both concurred in finding that he was capable of understanding the nature and consequences of the proceedings against him and capable of assisting properly in his defense. With respect to Mr. Wessel's behavior on the day of trial, the standard is that the court has to make a determination as to whether the defendant is capable of assisting in his own defense and understanding the nature and consequences of the proceedings against him, not whether he will ultimately choose to do so. And Dr. Schenck specifically predicted that he given his history, given her diagnosis, that he would create difficulties at trial and that what actually did happen was likely to happen. And so his behavior was consistent with the evidence they reviewed and their understanding of his condition. And Your Honor, the one other point that I wanted to address with respect to the schizophrenia diagnosis, Dr. Campbell specifically ruled out schizophrenia and Dr. Schenck testified that or provided an opinion stating that she did think the evidence was at odds with that diagnosis. And so neither Dr. Schenck nor Dr. Campbell believe that that was a plausible explanation for Mr. Wessel's presentation. Can you tell me how the knowing and voluntary requirement for waiver of a jury trial is different than the requirement for competence to participate in one's own defense? Certainly, Your Honor. The competency determination refers to the standard that I've been discussing in terms of the ability to understand the nature and consequences of the proceedings and the ability to assist properly in one's own defense. And the jury waiver standard adds the requirement that in the moment that you waive your right to a jury, that it be knowing and voluntary. And as that issue arose in this case, the government's position is that it's a bit of a sideshow and a bit of a diversion because the soundness of the court's refusal to accept the jury waiver is not an issue in this appeal. And Mr. Wessel is raising it to argue that it creates an inference that the judge didn't believe her own decision with respect to his competence. But of course, the judge did make a decision and it's an extensively reasoned decision and she cites a lot of evidence to support it. But the reason that she found that it was not knowing and voluntary is that she attempted to engage in a dialogue with him, as is the requirement and the standard practice. And he simply refused to engage. And this is consistent with his pattern of disruptiveness and malingering that both Dr. Campbell and Dr. Schenk diagnosed and predicted. And he claimed to be 25, I believe, even though he was in his early 30s. He claimed not to know whether he had graduated from high school. He would not answer with clarity with respect to whether he understood the right that was at stake. And so in light of those answers, I think the court reasonably concluded that it was not a knowing and voluntary decision that he was proposing, regardless of whether he was competent to make it. Is he currently in prison? Excuse me, is he currently in prison? Yes, your honor. And what's going on in prison? This is what's kind of confusing to me is we're beyond that. He's in there for from a felon in possession, right? That's correct, your honor. Yeah. And so and how many years is he in for? He was sentenced to a term of 100 months imprisonment, your honor. I have not been informed regarding his current carceral status or how he's being treated there. So but I would presume that he is continuing to be incarcerated based on the term of sentencing and the date of about how he's getting along in prison. But that's not doing that right now. Unfortunately, I'm not able to provide further information on that. I see that I've I've reached the end of my time. So the government would respectfully ask that the court affirmed the district court's judgment. Thank you, your honors. Thanks to you, Mr. Ranga. And we'll go back to Miss Farner. You have one minute. Thank you, your honor. I just want to make one quick statement about this characterization of Mr. Wessel's mental health through the lens of Dr. Shank's opinion. Judge Pratt said, I have to rely on the experts. And once Judge Pratt made that decision, she chose to view the entire case through the lens of all of Mr. Wessel's conduct was volitional. And one quick example of that is in her order, she says, Mr. Wessel quit college because he was on drugs. What's lacking from that is any of the evidence that Mr. Wessel was starting, what was a good student in elementary, middle school, high school, three semesters of college, and then tanked and that his father was schizophrenic. That's the right age for schizophrenic symptoms to appear. But because we're seeing it through the lens of volitional conduct, what makes it into the order was he quit because he was on drugs. And I think that opposing counsel made the same mistake when characterizing his trial behavior as volitional. We expect him to make problems because Dr. Shank said he would. And so we see it as volitional. Mr. Wessel saw this case through the lens of there are people in Chicago waiting to kill me. I want the longest sentence possible so I can be safe from these people. I want life. And his mental instability and those persistent delusions made it impossible for trial counsel to have a meaningful relationship with Mr. Wessel. And for these reasons, we ask for Mr. Owen. I just wanted to make one final point that he will get out in 2023. I do not believe he is currently medicated. He will not currently talk to counsel. And he last said he does not believe he has a pending appeal. Okay. Ms. Varner, thanks for your work on behalf of your client for the argument today. We'll take the case under advisement and the court will stand in recess. Thanks to both of you.